No. 24-1557

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MARK SORENSEN,
*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 1:19-cr-00745
Franklin U. Valderrama, District Court Judge

_____

## REPLY BRIEF OF
## DEFENDANT-APPELLANT MARK SORENSEN

_____

Stephen Chahn Lee
LAW OFFICE OF STEPHEN
CHAHN LEE, LLC
209 South LaSalle Street, Suite 950
Chicago, IL 60604
(312) 436-1790

Andrianna D. Kastanek
*Counsel of Record*
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
akastanek@jenner.com

*Counsel for Defendant-Appellant*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION .............................................................................1

ARGUMENT .....................................................................................3

I.   The Government's Evidence Did Not Establish that Sorensen
     Willfully Paid for Referrals, or Conspired to Do So. ................3

     A.   Sorensen Did Not Forfeit his Challenge to the Legality of
          His Conviction. ....................................................................3

     B.   SyMed's Payments Were Not for "Referrals" Under the
          Anti-Kickback Statute. ........................................................5

II.  The District Court Erroneously Instructed the Jury on the Meaning
     of "Referral." ......................................................................... 13

III. The Government's Witnesses Impermissibly (and Wrongly) Testified
     About the Law. ....................................................................... 14

CONCLUSION............................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CFE Racing Prods., Inc. v. BMF Wheels, Inc.,*
   793 F.3d 571 (6th Cir. 2015)......................................................... 18

*Redman v. RadioShack Corp.,*
   768 F.3d 622 (7th Cir. 2014)......................................................... 13

*Safeco Ins. Co. of Am. v. Burr,*
   551 U.S. 47 (2007)........................................................................ 13

*United States v. Bowling,*
   952 F.3d 861 (7th Cir. 2020)......................................................... 17

*United States v. Dubin,* 27 F.4th 1021 (5th Cir.) (Oldham, J.,
   concurring), *cert. granted,* 143 S. Ct. 416 (2022), *vacated and
   remanded on other grounds,* 599 U.S. 110 (2023) ..........................4

*United States v. Duran,*
   407 F.3d 828 (7th Cir. 2005)..........................................................5

*United States v. Espino,*
   32 F.3d 253 (7th Cir. 1994).......................................................... 15

*United States v. George,*
   900 F.3d 405 (7th Cir. 2018)..................................................... 5, 12

*United States v. Graham,*
   47 F.4th 561 (7th Cir. 2022) ........................................................ 16

*United States v. Jones,*
   763 F.3d 777 (7th Cir. 2014), *vacated by United States v.
   Drake,* 774 F.3d 1104 (7th Cir. 2014) ...........................................4

*United States v. Locke,*
   643 F.3d 235 (7th Cir. 2011)........................................................ 15

*United States v. Marchetti,*
   96 F.4th 818 (5th Cir. 2024) ........................................... 10, 11, 12

*United States v. Nagelvoort,*
856 F.3d 1117 (7th Cir. 2017)....................................................... 17

*United States v. Polin,*
194 F.3d 863 (7th Cir. 1999)........................................................ 10

*United States v. Vernon,*
723 F.3d 1234 (11th Cir. 2013).................................................... 10

**Statutes**

42 U.S.C. § 1320a-7b(b)(2)(A)..............................................................5

**Other Authorities**

Medicare and State Health Care Programs: Fraud and Abuse;
OIG Anti-Kickback Provisions, 56 Fed. Reg. 35,952 (July 29,
1991) (to be codified at 42 C.F.R. pt. 1001) ..................................7

# INTRODUCTION

The government makes a number of implicit concessions. It concedes that not all payments to advertisers or marketers violate the Anti-Kickback Statute, even if on a percentage basis; the statute is violated only if the advertiser or marketer receiving the payment is in a position to "leverage[] fluid, informal power and influence" over healthcare. Gov. Br. 23.[1] The government contends that this standard was met with respect to Perconti and the marketers—but only because they "steer[ed]" patients to Symed, *id*. at 20. Yet, the government concedes that the patients' physicians (contacted by the marketers) were responsible for making the decision whether to authorize the equipment requested, *id*. at 4-5, and that physicians responded to the marketers' outreach only 20% of the time, leaving 80% of cases in which no order was filled as a result of the physician's decision, *id*. at 6.

In short, the government's initially bold theory, including that percentage-based arrangements relating to Medicare are unlawful, has boiled down to a narrow focus on an issue on which the government introduced very little evidence: that of whether patients and physicians were provided choice regarding supplier. At a minimum, this means that the district court's broad instruction on the definition of referral was incorrect. The court did not instruct

---

[1] Sorensen's opening brief is cited as "Br." The government's answering brief is cited as "Gov. Br." Other abbreviations remain the same as in the opening brief.

the jury to consider whether Perconti, Anderson, and O'Neil were in a position to leverage informal power and influence, or whether Sorensen, in paying Perconti's company, intended to influence the exercise by Perconti, Anderson, and O'Neil of any such power and influence. This also requires acquittal. The only evidence in the record on the topic of supplier choice shows that patients were told that Symed was the preferred supplier and that patients were asked to consent to Symed fulfilling orders by their doctors.

In any event, it cannot be that an exclusive supplier agreement between a manufacturer (PakMed) and supplier (Symed), or the marketing of a supplier, is a *per se* violation of the Anti-Kickback Statute. The agreement must reflect intent to influence healthcare decisionmaking and thus to obtain a referral.

At trial the government attempted to close gaps in its legal theory by eliciting testimony on the scope of the Anti-Kickback Statute, the most prejudicial example being Perconti's testimony about a conversation with his attorney for which Sorensen was not present. In this conversation, the attorney allegedly opined on *precisely* the issue to be decided by the jury—the legality of the billing arrangement between Sorensen and Perconti—and did so incorrectly. This testimony was unfairly prejudicial, misleading, and hearsay, and this Court should reverse.

# ARGUMENT

## I. The Government's Evidence Did Not Establish that Sorensen Willfully Paid for Referrals, or Conspired to Do So.

### A. Sorensen Did Not Forfeit his Challenge to the Legality of His Conviction.

The government urges this Court to apply a plain-error standard to Sorensen's argument that he did not willfully pay renumeration to others in exchange for referrals, because while he filed a motion for acquittal, he focused his argument on willfulness, not on the definition of referral. Gov. Br. 15-16, 24. This is wrong. Sorensen consistently argued, first in his Rule 29 motion for acquittal and then in a renewed post-trial motion for acquittal, that his arrangement with Perconti was not illegal.

At the close of the government's evidence, for instance, Sorensen's counsel argued that the government had not presented evidence of an agreement to violate the Anti-Kickback Statute. He explained:

> [A]dvertisement for any type of medical supply or anything like that is completely lawful. Once somebody opts in, you call them, that is completely lawful and appropriate. Getting the patient authorization to contact their doctor is completely lawful. And it is completely lawful to pay somebody for their time to collect the paperwork and to do the documentation. … [T]he government is … co-mingling completely lawful activities to … bootstrap it and call it, buying signed prescriptions.

Tr. 1243. Sorensen's counsel also argued, as Sorensen does on appeal, that the government was required to prove that Sorensen "willfully took certain actions

based upon ... knowledge" that the conduct was illegal, and "the evidence is simply lacking." *Id*. at 1244. Thus, "[w]hile [Sorensen] has refined his arguments on appeal, as [the Court] might expect a defendant to do, his challenge to the sufficiency of the evidence as to conspiracy at trial encompassed his finer-tuned argument" regarding where he intended to pay for referrals. *United States v. Jones,* 763 F.3d 777, 811-12 (7th Cir. 2014) (rejecting argument that defendant waived argument by making a more specific challenge to his conspiracy conviction), *vacated by United States v. Drake*, 774 F.3d 1104 (7th Cir. 2014).

The rule that a specific Rule 29 argument forfeits arguments not raised is motivated by concerns of sandbagging. As Judge Oldham explained in *United States v. Dubin*, 27 F.4th 1021 (5th Cir.) (Oldham, J., concurring), *cert. granted*, 143 S. Ct. 416 (2022), *vacated and remanded on other grounds*, 599 U.S. 110 (2023), if a defendant could "belatedly object[ ]" to new issues using untimely Rule 29 motions, a criminal could "argue one legal theory to the jury, lose on that theory, [then] ... argue a completely new theory after dismissal of the jury." *Id.* at 1033-34. But here, Sorensen's consistent theory has been that his billing services arrangement with PakMed did not violate the Anti-Kickback Statute. *See, e.g.*, Tr. 1425 (arguing in closing that "the first [contract] was compliant" and the second contract was "more compliant"); *id.* at 1427 ("the percentage was never illegal"); R. 200 at 6 (arguing in post-trial

motion that the government "produced no evidence that Sorensen had an inkling that SyMed's percentage-based contract with Pakmed was unlawful").

In any event, Sorensen's challenge to the sufficiency of his conviction turns on a question of law, which when "presented as part of a sufficiency of the evidence challenge" should be "reviewed de novo." *United States v. Duran*, 407 F.3d 828, 840 (7th Cir. 2005). This Court has explained that de novo review allows it to "ensur[e] that a valid legal theory supports the conviction and that there is some evidence from which a rational jury could find in favor of that legal theory." *Id.* at 842. Even if this Court were to somehow conclude that Sorensen did not preserve his sufficiency arguments, it should nonetheless review the conviction here for a "valid legal theory." *Id.*

B. **SyMed's Payments Were Not for "Referrals" Under the Anti-Kickback Statute.**

To make a referral for renumeration prohibited by the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A), the payee must, at a minimum, "leverage fluid, informal power and influence" over healthcare. *United States v. George*, 900 F.3d 405, 411 (7th Cir. 2018) (quotation omitted). The government acknowledges this, citing *George*'s "informal power and influence" language repeatedly. Gov. Br. 23, 25, 27. Elsewhere, the government itself admits that, to make a referral, the person receiving renumeration must be able to "'steer[ ] a patient to a particular provider.'" *Id.* at 17 (quoting *United*

*States v. Patel*, 778 F.3d 607, 612-13, 615 (7th Cir. 2015)).

The government says the evidence allowed the jury to find that Sorensen paid the brace manufacturer (PakMed) and marketers (Byte and KPN), intending for them to steer patients to him. No reasonable jury could have concluded this based on the evidence presented and the arguments made. Symed made payments only to PakMed, which made no medical choices. To be sure, PakMed then paid marketers; but there is no evidence in the record that Sorensen was part of those arrangements, and in any event, those marketers also made no medical choices.

To begin, the government makes only a half-hearted attempt to argue that Perconti (PakMed) could have "steered" patients to Symed. Gov. Br. 17-21. PakMed had no contact whatsoever with any patient. It had no contact with the patient's physician. It had no "power or influence" over or even access to patients, other than that attained via the marketers. The government's claim that Perconti "selected Symed as the DME supplier for the patients' braces" (*id*. at 19) is wrong; the ultimate choice whether to use Symed as a supplier for a PakMed product was left to and made by the patient and doctor, as discussed below.

With respect to Sorensen's alleged arrangement via Perconti with marketers, the government's argument is based on two different theories. First, the government argues that the marketers "collect[ed] personal

information from potential patients," and "used that information to 'chase' prescriptions for braces from those patients' doctors," which they then "forwarded ... to Symed." *Id*. at 23. This theory is not a valid interpretation of the Anti-Kickback Statute. Such conduct might raise privacy and consent concerns under different facts (not here, where the evidence showed patients gave consent to obtain authorization from their physicians[2]); but it would be plainly absurd to interpret the Anti-Kickback Statute to criminalize a provider or patient representative helping to facilitate a valid prescription just because that representative was paid by a party other than Medicare.[3]

Second, the government argues that call center representatives "notified the customer" that Symed would be filling their order without "giving the patient an opportunity to select a different DME provider," thus depriving the

---

[2] *See* Tr. 1147-48 (O'Neil agreed that call-center representatives received authorization from patients to contact doctors); *see also* Gov. Ex. 118 at 44 (stating that patients were asked: "We can contact your doctor to see if he/she would like us to send you a new back brace, okay?").

[3] Addressing HHS-OIG's statements on this subject (Br. 4, 30), the government quotes an additional part of the guidance that states that promoter and consultant participation in marketing activities that "encourage health care providers and others to violate the statute" do not qualify for "safe harbor protection" (Gov. Br. 25). But here the marketers did not "encourage health care providers and others to violate the statute," and even HHS's specific examples—that it could be unlawful to "develop impermissible joint venture agreements or to routinely waive coinsurance and deductible amounts owed under Medicare Part B," Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35,952, 35,974 (July 29, 1991) (to be codified at 42 C.F.R. pt. 1001)—distinguish the guidance from this case. The provided examples are all situations in which the marketer or another party encourages a *doctor* or *supplier* to engage in illegal conduct, and cannot be read to say that paid marketing or advertising to obtain patients is itself illegal.

patient of choice. Gov. Br. 19; *see also id*. 23 ("forwarded those prescriptions …

apparently without involving either the doctor or the patient in that routing

decision"). This theory, however, hinges on a faulty factual assumption that

both the patients and the physicians here did not know that Symed would be

the supplier for the braces, when the government's own evidence clearly

showed otherwise.

The ***only*** evidence the government introduced at trial about what was

said by the advertisers or call center representatives to patients about supplier

choice was Government Exhibit 118, which was a review of KPN's practices

that included portions of the script provided to KPN call center

representatives. *See* Tr. 1127. A portion of the script entitled "MUST READ

CONSENT STATEMENT VERBATIM" instructed call center representatives

to disclose to the patient "our recommended supplier" (Symed), explain that

the supplier would check with "your doctor and insurance company for their

approval," and ask: "Is that OK?" Gov. Ex. 118 at 24. Other than this script,

there was ***zero*** evidence about this key part of the conversations with patients.

No patients or call center representatives testified. No other scripts were

introduced into evidence. In other words, according to the sole evidence about

what marketers said to patients, patients were, in fact, advised of Symed and

were, in fact, asked for and provided consent to send their information to

Symed to fulfill their requested prescription.[4]

This is corroborated by the prescription authorization requests sent by Byte to physicians. As the government concedes (Gov. Br. 19), Byte's prescription forms had Symed's name prominently displayed at the top:



Gov. Ex. 2021 at 4. A doctor who received this order for braces, signed it, and returned it to Byte hardly could be characterized as not making an "independent decision" regarding their patient's care, as the government

---

[4] Regarding Byte, the government relies on Government Exhibit 2012, a one-page summary by Anderson of a January 2015 call. The exhibit, however, contained no excerpts of or quotes from Byte's scripts. The government argues that a jury could have inferred from one sentence in the summary that Anderson did not give patients an "opportunity" to select a different DME supplier, but the government introduced no evidence about what was actually said and nothing indicating that Byte acted differently than KPN in seeking consent from patients.

claims. Gov. Br. 19.

In fact, if the doctor believed that a brace was necessary but wanted to have the brace provided by a different company, the doctor simply would not have signed the order. And indeed, this routinely occurred: Per O'Neil and Perconti, physicians declined 80% of the orders requested by KPN and regularly failed to return orders requested by Byte.[5] Tr. 1151, 783-784, 1085; Gov. Br. 6. What the government is left with, then, is that the marketers did as they were hired to do: they marketed products to patients who responded to advertisements, proposed that Symed be the DME supplier for such products, and worked to fulfill the patient's request for the product if authorized by both the patient and the patient's doctor.

Consistent with *United States v. Marchetti*, 96 F.4th 818 (5th Cir. 2024), this Court should reject the government's invitation to make this a crime. In fact, the government cites *Marchetti* favorably, choosing to analogize it to these facts rather than dispute its reasoning. Gov. Br. 27-29. To recap, the government in *Marchetti* "almost exclusively lean[ed] on the fact that

---

[5] These facts distinguish this case from *United States v. Polin*, 194 F.3d 863 (7th Cir. 1999), where "[n]ever in his fourteen year career was [the payee's] suggestion [as to the monitoring service] rebuked by a physician." *Id.* at 866. Here, by contrast, the doctors often rejected the orders sent by the advertisers—in fact, far more often than not. Given that the doctors retained the ultimate control over the authorization, this case is also not like *United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013), where patients "gave control" of the decision where to fill prescriptions to the payee. *Id.* at 1254.

Marchetti was compensated based on the 'value of each referral." 96 F.4th at 826. Here too, the government's case against Sorensen was infected with its theory that percentage-based contracts are *per se* illegal under the Anti-Kickback Statute. *See, e.g.*, Tr. 1375 ("They knew they were paying for percentages and they knew what they were getting for it."). A percentage-based arrangement, however, is "not *per se* unlawful," the Fifth Circuit explained. 96 F.4th at 831 ("[T]he payments have to be made in order *to induce an unlawful referral*," which "requires proof beyond showing that a percentage-based compensation contract existed." *Id*. (emphasis added)). The payment must be intended to influence someone who "make[s] healthcare decisions on behalf of patients" or has improper influence over such a decisionmaker, which the marketer in *Marchetti* did not do or have. *Id*. at 826-27. As a marketer, Marchetti did what an advertiser is "hired to do"—promote the laboratory— which is "[p]lainly" not "improper." *Id*. at 827.

The government states that this case is more like the aspect of the *Marchetti* scheme for which the Fifth Circuit allowed Marchetti's conviction to stand: where Marchetti, working as a marketer for two competing laboratories, made the decision what lab to send the samples to, while "hid[ing] [that decision] from the patients and providers." 96 F.4th at 827. The Fifth Circuit held that, in that situation, Marchetti himself became the relevant decisionmaker and the payments he received were intended to induce *his*

referrals. *Id*. But here, Symed's role as the supplier was not hidden from the patient or physician, who ultimately decided whether to prescribe and order the brace. And, perhaps more importantly, there is no evidence that the marketers were working for and selecting between competing providers.

Finally, the government leans on *United States v. George*, 900 F.3d 405, 411-12 (7th Cir. 2018), to argue that a payee need not be a decisionmaker to violate the Anti-Kickback Statute. The government is correct insofar as this Court in *George* rejected the interpretation offered by the defendant there: that "the statute is limited in its application to persons who are the 'relevant decisionmakers' or who are at least persons in a similar position as the relevant decisionmaker." *Id*. at 411. Governing case law, the *George* opinion explained, does not require "formal authority to effect the desired referral or recommendation." *Id*. (quotation omitted). But this does not mean that the statute is limitless, and in fact, *George* emphasized that the payer must "inten[d] to induce referrals" consistent with "Congress' concerns in the statute with imposing liability on operatives who 'leverage fluid, informal power and influence.'" *Id*. (quotation omitted). This Court should adhere to that definition and hold that Symed's payments to PakMed were not intended to induce "referrals" by the marketers under the Anti-Kickback Statute.

\* \* \* \*

Even if this Court were to somehow conclude that the evidence allowed

the jury to find that Sorensen paid remuneration with intent to induce a "referral," he could not have done so willfully. A "possible, indeed plausible, possibly even correct" interpretation of a statute does not allow for "an inference of willfulness." *Redman v. RadioShack Corp.,* 768 F.3d 622, 640 (7th Cir. 2014). *Cf. Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007) (finding no reckless liability where "Safeco's reading was not objectively unreasonable" in light of a "dearth of guidance and the less-than-pellucid statutory text").

Evidence that Sorensen knew that he could not pay for referrals, (*see* Gov. Br. 29-31), is circular: it begs the question of what it means to pay to induce a "referral" and whether Sorensen understood the term as the government argues. So too is evidence related to whether Sorensen believed hourly-rate arrangements to be preferable to percentage-based agreements: A percentage fee is not itself unlawful without intent to induce an impermissible referral. Sorely lacking from the evidence presented to the jury was proof that Sorensen knew his payments to PakMed or PakMed's subsequent payments to marketers were unlawful. Without that proof, there could be no willfulness.

## II. The District Court Erroneously Instructed the Jury on the Meaning of "Referral."

The district court broadly instructed the jury that a referral under the Anti-Kickback Statute is "any action that directs a patient to a particular provider of services." Tr. 1359. While taking issue with Sorensen's proposal to

limit the payees to physicians or providers of services, (Gov. Br. 33-34), the government does not defend the definition given. It instead *repeatedly* acknowledges in its defense of Sorensen's conviction that the Anti-Kickback Statute requires payment with intent to induce action by someone with influence over healthcare, for example, by a person who was "in a position to steer patients" to a provider or supplier. *Id.* at 21; *see also id.* at 27 (citing Congress's "concerns in the statute with imposing liability on operatives who 'leverage fluid, informal power and influence'"); *id.* at 28 (acknowledging *Marchetti*'s holding that an advertiser does not make a referral unless it "unduly influence[s]' or 'act[s] on behalf of' the purchaser").

At the very least, this Court should reverse because the district court did not instruct the jury in accordance with the applicable definition of referral. Even if the Court does not find Sorensen's competing proposed definition to be fitting (and it should for the reasons identified in the opening brief, *see* Br. 39-41), the jury was operating under an inaccurate definition that permitted conviction absent a payee capable of making a referral.

## III. The Government's Witnesses Impermissibly (and Wrongly) Testified About the Law.

The district court improperly allowed the government to elicit impermissible legal opinion from its witnesses, including O'Neil and Perconti,

about the definition of referral and the legality of percentage-based agreements.

***O'Neil***. For instance, among other things, O'Neil testified that his crime was that of "accept[ing] payment for marketing services as a *percentage of revenues* collected by a covered entity." SA52 (emphasis added); Br. 43-44 (detailing O'Neil's other testimony on this subject). The government characterizes this as not "opinion" testimony but instead a simple description of his offenses leading to his guilty plea. Gov. Br. 41. This Court has said otherwise: A co-defendant's or cooperator's testimony about his role in an offense can cross the line into "unhelpful opinion testimony" where the testimony is in the form of a legal conclusion. *United States v. Espino*, 32 F.3d 253, 257-58 (7th Cir. 1994) (Rule 701 proscribes admission of "conspiracy"). *Cf. United States v. Locke*, 643 F.3d 235, 241 (7th Cir. 2011) (explaining that prosecutors, under Rule 701, could not "deliberately elicit[ ] testimony about whether Locke knowingly made a material misrepresentation to deprive the lenders of money," which would have been "unhelpful opinion testimony" (quotation omitted)).

The government's only response to *Espino* is in the context of the Perconti discussion, where the government claims *Espino* is distinguishable because Perconti's testimony provided the jury "important factual context." Gov. Br. 49. Even if true, the same cannot be said of O'Neil's characterization

of accepting payment for "marketing services as a percentage of revenues" as illegal—a legal conclusion that is not only unnecessary factual context but also flatly wrong.

*Perconti.* Most problematic of all was Perconti, who was permitted to relay his lawyer's opinion on the illegality of the percentage-based arrangement between Symed and PakMed—despite Sorensen not being present for that conversation, Perconti not relaying key parts of the conversation to Sorensen, and serious concerns about prejudice.

At trial, the government argued that Perconti's testimony about his out-of-court conversations with his attorney was admissible, despite hearsay rules, for "[i]mpression on the listener." SA35. The government again defends this rationale on appeal, arguing that "Perconti's understanding of the legality of his billing agreement with Sorensen was highly relevant to the questions that the jury had to decide." Gov. Br. 48. But the trial viewed as a whole, including the government's attempts to elicit testimony about the illegality of percentage-based agreements, *see, e.g.*, SA26, 43-45, 54-55, suggests that the government's justification was pretextual: The government wanted the jury to hear that percentage-based compensation was illegal and accomplished that goal via its improper questioning of Perconti. *See United States v. Graham*, 47 F.4th 561, 567-68 (7th Cir. 2022) (rejecting government's claim that out-of-

court statements were used to show effect on victim where statements were admitted in a way that "invited the jury to accept [them] as true").

Of course, if Perconti were the defendant, his state of mind would have been a critical element. But he was not, and counsel is not aware of any case in which this Court has approved introduction of extensive conversations between a witness and an attorney about the legality of the precise conduct at issue in the trial to show the effect on the *witness*—and the government cites none. The government relies on *United States v. Nagelvoort*, 856 F.3d 1117 (7th Cir. 2017) (Gov. Br. 47), but the memoranda there were sent to the *defendants* who were on trial and thus constituted "evidence that [*the defendants on trial*] had knowledge of the Anti-Kickback Statute, its purpose, and its prohibitions." 856 F.3d at 1126 (emphasis added). The analogy here would be if Sorensen were present for the conversation with Perconti's attorney. He was not.[6]

---

[6] This also distinguishes *United States v. Bowling*, 952 F.3d 861 (7th Cir. 2020), cited by the government (at 42) as an example of a witness being permitted to testify about her "personal thoughts" on the fraud. But the witness there was asked about an email that she received from the defendant, who was surreptitiously using another person's account, and this Court held that the government's question about the witness's impressions of the email was "carefully worded to elicit [the witness's] personal thoughts at the time she received the subject email," the witness was testifying only about "her reaction at the time based on her own perception," and that she "used the term [fraud] in the colloquial sense." *Id*. at 868-69. Here, Perconti's testimony far exceeded these bounds: he did not just provide his reaction based on his own perception but relayed a *detailed* account of his out-of-court conversation with his attorney in which the *attorney* opined on the *legality* of the arrangement between Sorensen and Perconti.

The testimony was also plainly improper under Rule 403. Through introduction of his attorney's out of court opinion, Perconti testified about the ultimate issue in this case: whether Perconti's agreement with Sorensen was unlawful under the Anti-Kickback Statute. The prejudicial nature of that testimony can hardly be underestimated. Even if it was not hearsay and not violative of Rule 701 (which it was), it was plain error for the district court to allow the testimony, as it was fundamentally unfair and violated the jury's province. *See CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 587-89 (6th Cir. 2015) (witness's testimony about conversations with his attorney were not allowed where used "as a means of suggesting to the jury what protection against similar marks [p]laintiff could properly claim").

*Harmlessness*. The government's last ask is that the Court find error on the repeated admission of opinion about the illegality of percentage-based fees to be harmless. Gov. Br. 50-52. The Court should decline that invitation.

As the district court noted, the sufficiency of evidence regarding Sorensen's state of mind was a "close call." A24. The government relied heavily on inferences based on evidence that could be interpreted in multiple ways. It relied on an interpretation of the statute that, as applied to these facts, is at the *very least* questionable. It attempted to close those gaps by repeatedly eliciting impermissible—and wrong—legal opinion from its lay witnesses about the permissibility of percentage-based agreements, and in relying on

that opinion in asking the jury to find Sorensen guilty. *E.g.*, Tr. 1375. This testimony was highly prejudicial, and this Court should correct it.

## CONCLUSION

For the reasons explained above and in his opening brief, Defendant-Appellant Mark Sorensen respectfully requests that this Court vacate his judgment and conviction, remand the case for a new trial, and order any other just and appropriate relief.

Date: October 11, 2024                    Respectfully submitted,

Stephen Chahn Lee                         /s/ Andrianna D. Kastanek
LAW OFFICE OF STEPHEN CHAHN LEE, LLC      Andrianna D. Kastanek
209 South LaSalle Street, Suite 950         *Counsel of Record*
Chicago, IL 60604                         JENNER & BLOCK LLP
(312) 436-1790                            353 North Clark Street
slee@stephenleelaw.com                    Chicago, IL 60654
                                          (312) 222-9350
                                          akastanek@jenner.com


*Counsel for Defendant-Appellant Mark Sorensen*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

1.　　This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the word count function of Microsoft Office Word 365, this brief contains 4,458 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.　　This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 13 point Century Schoolbook for the main text and 12 point Century Schoolbook for the footnotes.

Dated: October 11, 2024

/s/ Andrianna D. Kastanek
Andrianna D. Kastanek

## CERTIFICATE OF SERVICE

I, Andrianna D. Kastanek, an attorney, hereby certify that on October 11, 2024, I caused the **Reply Brief of Defendant-Appellant Mark Sorensen** to be electronically filed with the Clerk of the Court for the United States Court Of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to ECF procedure (h)(2) and Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause fifteen (15) copies of the above-named brief to be transmitted to the Court via UPS overnight delivery, delivery charge prepaid, within five days of that date.

/s/ Andrianna D. Kastanek
Andrianna D. Kastanek